UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAMUEL SANTIAGO,<br>    *Plaintiff,*<br>    *v.*<br>DEPARTMENT OF TRANSPORTATION,[1]<br>DOREEN ROSSI, JAMES REDEKER, BENJAMIN<br>ALEJANDRO AND SUSAN PAULAUSKAS,<br>    *Defendants.* | Civil No. 3:12cv132 (JBA)<br><br>September 25, 2014 |

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Samuel Santiago, an employee of the Connecticut Department of Transportation ("DOT"), alleges that Defendants, employees of the DOT, interfered with his rights by denying him leave under the Family and Medical Leave Act ("FMLA") and retaliated against him for exercising his rights under the FMLA by placing him on unpaid leave.[2]  Both sides have moved for summary judgment with Defendants moving [Doc. # 79] for judgment on all counts and Plaintiff moving [Doc. # 80] for judgment on Count

---

[1] The Department of Transportation has been dismissed as a defendant by the Court's Ruling [Doc. # 39] on Defendants' Motion to Dismiss.  The Clerk is directed amend the caption accordingly.

[2] Plaintiff's two-count Second Amended Complaint [Doc. # 63] alleges that Defendants interfered with his FMLA rights (Count One) and retaliated against him for attempting to exercise such rights (Count Two) and seeks monetary damages and reinstatement of employment benefits and accrued time off that Mr. Santiago was forced to expend as a result of Defendants' interference.  Mr. Santiago has also filed a separate action in state court, alleging disability discrimination and failure to accommodate in violation of the Connecticut Fair Employment Practices Act.  (*See Santiago v. DOT*, Complaint, Ex. V to Pl.'s Loc. R. 56(a)1 Stmt. [Doc. # 80-2].)

One (FMLA interference) only.   For the reasons that follow, Defendants' motion is denied in part and granted in part and Plaintiff's motion is denied.

I.      **Facts**

Plaintiff Samuel Santiago has been employed by the DOT since 1998 and from 2006 until October 2012 held the position of Material Storage Supervisor II, a position that required considerable overtime during the snowy winter months.  (Santiago Dep. Tr., Ex. A to Pl.'s 56(a)1 Stmt. [Doc. # 80-2] at 27.)  In 2000, Mr. Santiago was diagnosed as suffering from "cluster headaches," which are more intense than a migraine attack and have been described as a "suicide headache" because some people have taken their own lives during an attack or in anticipation of one.  (Cleveland Clinic, Cluster Headaches, Ex. T to Pl.'s 56(a)1 Stmt. at 1.)

Mr. Santiago first notified the DOT of his medical condition in a May 12, 2011 letter to Doreen Rossi, the Principal Human Resources Specialist.  Mr. Santiago wrote "I suffer from cluster headaches which are worse than migraines" and "are completely disabling and can last for hours to days depending on the episode."  (May 12, 2011 Ltr. Santiago to Rossi, Ex. G to Pl.'s 56(a)1 Stmt.)  Mr. Santiago explained that his treating physician, Dr. Edmund West, had tried different treatments, including medication, over the years but with "very little success."  (*Id.*)  Dr. West and Mr. Santiago determined that Mr. Santiago's "excessive work schedule" on occasions when he was required to work "more than 8 hours a day more than 40 hours a week [was] one of the main factors that trigger[ed] [his] cluster headaches and [caused him] not to be able to perform [his] job duties," and since 2009, Dr. West had suggested that Mr. Santiago limit his work schedule.  (*Id.*)

2

Because Mr. Santiago's position required mandatory overtime, he did not report his condition but instead sought alternative employment within state government. Because he was unsuccessful in this search, Mr. Santiago told Ms. Rossi that his "condition is getting worse and I cannot tolerate the pain I am in anymore" and requested that she "notify my supervisor . . . of my limited hours of work restrictions."  (*Id.*)

After receiving this letter, Ms. Rossi invited Mr. Santiago to her office for a meeting in which she explained to him that overtime was an essential function of his position and that under Article 39 of his Union Contract if he was unable to perform an essential function of his position, the DOT would search for a position with "less arduous duties" but if none was found, he would either have to apply for disability retirement or the DOT would initiate "separation proceedings."[3]  (Rossi Aff. ¶¶ 7–12, Ex. 3 to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 79-2]; Santiago Dep. Tr. 66–67, 78.)

Ms. Rossi provided Mr. Santiago with the telephone number for his union representative and for Susan Paulauskas, a Human Resources Associate, to contact regarding FMLA leave and told him that he would have to submit a medical certificate and application if he wanted to apply for FMLA leave.  (Rossi Aff. ¶¶ 15–17.)  However,

---

[3] Article 39 of the governing union contract provides:

> When an employee has become physically or mentally incapable of the safe or efficient performance of the duties [of] his/her position by reason of infirmities or other disabilities, the appointing authority may attempt to transfer the employee to less arduous duties . . . .   [I]f no less arduous duties are found within the department, an employee may be separated from State service.

(Maintenance & Service Unit (NP-2) Contract between State of Connecticut and Connecticut Employers Union Independent (the "Union Contract"), Ex. 12 to Defs.' 56(a)1 Stmt.)

Ms. Rossi said that if his FMLA medical certificate indicated that he could not perform overtime, he would have to resign or seek disability retirement.  (Santiago Dep. Tr. at 67.) Ms. Rossi acknowledged during her deposition that she understood that Mr. Santiago was disclosing to her that he was suffering from a serious medical condition, but believed that Mr. Santiago's only option once he submitted the Medical Certificate was to go through the "Article 39" process in which he would either be put in a "less arduous" position or be separated from service.  (Rossi Dep. Tr. at 44, 105, Ex. B to Pl.'s 56(a)1 Stmt.)

After this meeting, Ms. Rossi contacted Janice Snyder, Mr. Santiago's manager, and informed her of the doctor's instruction that he not work overtime and Ms. Snyder agreed to restrict Mr. Santiago's overtime.  (Rossi Dep. Tr. at 64.)  However, Ms. Rossi contends that she did not have "the authority to order Ms. Snyder to not assign overtime to Mr. Santiago." (Rossi Aff. ¶ 19.)

Mr. Santiago submitted a Medical Certificate form (referred to internally at the DOT as a "P33A" form) completed by Dr. West and received by Human Resources on May 17, 2011 in which Dr. West certified that Mr. Santiago suffered from a "serious health condition" as defined by the FMLA, specifically "periodic severe headache[s]" that required him "to lie in dark room" and not use a computer.  (May 2011 Medical Certificate, Ex. Q to Pl.'s 56(a)1 Stmt. at 1.)  Dr. West checked a box indicating that Mr. Santiago was not currently incapacitated but estimated that going forward he would be incapacitated four times a year for up to three days at a time and could not perform any work during such periods.  (*Id.* at 2.)  Dr. West wrote that Mr. Santiago could not work over eight hour per days because doing so "precipitates" headaches.  (*Id.*)  Parts (a) and (b) of Question Four asking whether additional treatments would cause the patient to be

4

"absent from work . . . because of treatment on an intermittent or part-time basis" and requesting the probable number of such treatments was left blank.[4]   (*Id.* (emphasis omitted).)

Ms. Paulauskas, who was responsible for handling FMLA requests within the DOT, "assumed" upon receiving the Medical Certificate form that Mr. Santiago was requesting FMLA leave and mailed him an HR1 form ("Employee Request for Leave of Absence under the Federal Family and Medical Leave Act") requesting that he return it to her. (Paulauskas Dep. Tr. at 36–37, Ex. C to Pl.'s 56(a)1 Stmt.; Paulauskas Aff. ¶¶ 7–10, Ex. 10 to Defs.' 56(a)1 Stmt.)  Mr. Santiago did not return this form and because Question Four of the Medical Certificate was incomplete, Ms. Paulauskas denied his FMLA request because she did not have sufficient information to determine whether he would be receiving treatment by a physician at least two times per year as required for FMLA eligibility. (Paulauskas Dep. Tr. at 37–38, 70.)

Mr. Santiago contends that he and his physician were never informed that the Medical Certificate was not complete and Mr. Santiago did not recall ever being informed about the status of his FMLA request (Santiago Dep. Tr. at 60–61, 64–65), but Ms. Paulauskas maintains that on May 17, 2011 and May 27, 2011, she sent Mr. Santiago

---

[4] Dr. West did complete part (c) of Question Four, which asked for "a general description" of the "regimen of continuing treatment" that patient would require, writing that "Patient takes Imitrex, Fioricet as needed when he has a headache." (May 2011 Medical Certificate at 2.)

notices explaining that his application was incomplete and wrote "completed"[5] and highlighted and placed sticky notes on the sections where Mr. Santiago needed to complete additional information. (Paulauskas Dep. Tr., Ex. 2 to Defs.' Supp. Mem. [Doc. # 92] at 71; Paulauskas Aff. ¶ 12.)  In both instances, Ms. Paulauskas typed in a section of the form detailing the additional information needed:

> PLEASE SEE HIGHLIGHTED SECTIONS ON COPY OF THE MEDICAL CERTIFICATE (ATTACHED) THAT REQUIRE COMPLETION.  YOUR HEALTHCARE PROVIDER MUST INITIAL AND DATE ANY CHANGES TO THE FORM OR IT WILL NOT[] BE CONSIDERED COMPLETE.  Specifically: Section 4 A & B . . . are blank.  For FMLA qualification you must be seen by a doctor at least 2 x per year for f/u treatment for chronic or permanent condition.  All information must be completed for FMLA consideration.  Call if you have questions 860 594-3147.

(May 17, 2011 HR2b, Ex. 3 to Defs.' Supp. Mem. at 5; May 27, 2011 HR2a, Ex. 4 to Defs.' Supp. Mem. at 5.)[6]  On May 27, 2011, Ms. Paulauskas sent Mr. Santiago an additional form, writing by hand on the top "* Final reminder P33a [Health Certificate] incomplete For FMLA Determination[.]   No Response from employee—FMLA denied."  (May 27, 2011 HR2a, Ex. 4 to Defs.' Supp. Mem. at 1; Paulauskas Dep. Tr. at 81–82.)  In spite of these reminders, Mr. Santiago never submitted a complete application.

---

[5] Ms. Paulauskas did not believe that Mr. Santiago would be confused by her writing that these documents were "completed" when in fact they were incomplete, because she also included sticky notes and advising him what information was missing and highlighted the relevant sections of the form.  (Paulauskas Dep. Tr. at 136.)

[6] Defendants initially provided in discovery and submitted to the Court incomplete versions of these notices that omitted the pages where Ms. Paulauskas outlined the missing information, however, after oral argument, Defendants submitted a "Notice of Supplemental Authority" and attached complete versions of these notices as attachments.  (*See* Defs.' Supp. Mem. [Doc. # 92] at 4 & Exs. 3–4.)

On June 2, 2011, Ms. Rossi met with Mr. Santiago, his union representative and Ms. Snyder for approximately thirty minutes and discussed Mr. Santiago's request for a limited schedule.  At the end of the meeting, Mr. Santiago indicated that he was going to apply for disability retirement.  (Rossi Aff. ¶ 22.)  After the meeting, Ms. Rossi drafted a letter to Mr. Santiago confirming that he could "no longer perform the essential job functions" of his position and that the DOT had started the process of searching "for a less arduous duty assignment for" him.  (June 6, 2011 Ltr. Rossi to Santiago, Ex. J to Pl.'s 56(a)1 Stmt.)

On June 27, 2011, Ms. Rossi notified Mr. Santiago that the DOT had completed its search of "less arduous" available DOT positions "with negative result," and that unless Mr. Santiago's disability retirement application was approved, the DOT would proceed with the "separation process" as outlined in the union contract.  (June 27, 2011 Ltr. Rossi to Santiago, Ex. M to Pl.'s 56(a)1 Stmt. at 1.)  As a result, Mr. Santiago was placed on leave starting July 1, 2011, but he was not officially terminated from the DOT because he had approximately six months of accrued vacation and sick leave that he was able to use. (Rossi Dep. Tr. at 121; Pl.'s 56(a)1 Stmt. ¶ 69.)

While Mr. Santiago was on leave his attorney sent a letter to Defendant James Redeker, Acting Commissioner of the DOT (who is now the Commissioner), requesting that Mr. Santiago be allowed to return to his position but provided with "intermittent leave in the event of mandatory or assigned overtime."  (Aug. 10, 2011 Ltr. Parenteau to Redeker, Ex. R to Pl.'s 56(a)1 Stmt. at 6–7.)  Mr. Santiago never received a response and Mr. Redeker testified at his deposition that he did not know Mr. Santiago and did not have any knowledge of this case.  (Redeker Dep. Tr., Ex. E to Pl.'s 56(a)1 Stmt. at 10.)

As Mr. Santiago's accrued leave was becoming exhausted, in November 2011, he requested to return to work with the ability to take intermittent FMLA leave in a November 2011 meeting with his attorney, Ms. Rossi, and DOT attorney Paula Jean Yukna, and by submitting a completed Medical Certificate on November 25, 2011. (Rossi Dep. Tr. at 113, 249; Alejandro Dep. Tr., Ex. D to Pl.'s 56(a)1 Stmt. at 20.) Defendant Benjamin Alejandro, who replaced Ms. Paulauskas as FMLA administrator upon her retirement, never spoke with Mr. Santiago about this request, but informed Ms. Yukna that Mr. Santiago was not eligible for FMLA leave, because he had not worked 1250 hours in the past twelve months, as required for eligibility under the FMLA.[7]  (Alejandro Dep. Tr. at 11, 17, 22; Rossi Dep. Tr. at 133.)

On December 27, 2011, because he was unable to financially support his family, Mr. Santiago returned to work with no medical restrictions. (Santiago Dep. Tr., Ex. 1 to Def.'s 56(a)1 Stmt. at 135–36.) Dr. West completed an updated Medical Certificate removing his recommendation that Mr. Santiago not work overtime (Nov. 25, 2011 Medical Certificate, Ex. W to Pl.'s 56(a)1 Stmt.), and Mr. Santiago withdrew his retirement disability application. In a December 9, 2011 email, Ms. Yukna wrote to Mr. Santiago's counsel that once Mr. Santiago returned to work, if he was suffering from cluster headaches, he would need to take sick leave for an entire day, not just from required overtime, and that he "could be subject to discipline for refusing overtime

---

[7] No official agency response for Mr. Santiago's November 2011 request was included in the record and Mr. Alejandro acknowledged that although he was required to send such a response after receiving an FMLA request, "sometimes things did slip through the cracks" and may have in this instance. (Alejandro Dep. Tr. at 28.)

during snow and ice season" or for "excessive sick usage."  (Dec. 9, 2011 email Yukna to

Magdalena, Ex. S to Pl.'s 56(a)1 Stmt. at 1–2.)[8]

 In October 2011, Mr. Santiago left the DOT for the University of Connecticut,

where he worked as a purchasing assistant in a position that did not require overtime

through June 14, 2013 when he returned to the DOT, also as a purchasing assistant in a

position that did not require overtime.  (Santiago Dep. Tr. at 21, 24.)

## II.   Discussion[9]

The FMLA entitles eligible employees to take up to twelve work weeks of unpaid

leave annually for "a serious health condition that makes the employee unable to perform

the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D), which "may

be taken intermittently or on a reduced leave schedule," *id.* § 2612(b)(1).  "The FMLA

---

[8] Ms. Yukna wrote "If Mr. Santiago's headaches are so debilitating that he cannot work the essential job function of overtime then how is it that he can work his 8 hours per day?  It appears inconsistent for a person to have headaches so debilitating that he would be precluded from overtime for months yet is able to work a consistent 8-hour day during the same period of time."  (*Id.*)

[9] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

provides that at the end of an employee's leave the employee has the right to return to the position he held before the leave or its equivalent, though this right is not absolute," *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (citing 29 C.F.R. § 825.214(b)) and reinstatement may be denied "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness," 29 C.F.R. § 825.216(c).

The Act makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the act, 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the act, *id.*§ 2615(a)(2).   Interference includes "discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  An employee has a private right of action to seek both equitable relief and money damages "against any employer (including a public agency)," *id.* § 2617(a)(2), who violates the Act, *id.* § 2615(a)(1).

Plaintiff advances two theories of liability: (1) that Defendants wrongfully denied him FMLA leave and (2) that they "discouraged" him from exercising his FMLA rights. To make out a prima facie case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must show: (1) that he is an eligible employee under the FMLA; (2) that the defendant is an employer as defined in the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA.  *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004). "[C]ourts in the Second Circuit require a Plaintiff who asserts a FMLA interference claim

on a 'discouragement theory' to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave" or that "the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009).

### A.    Intermittent leave under the FMLA

Because Defendants contend that Mr. Santiago was not entitled to the kind of FMLA leave that he sought and Mr. Santiago's claims necessarily depend upon being denied benefits to which he was entitled under the FMLA, the Court will first consider this argument. Under the FMLA, an employee is entitled to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *Id.* § 2611(11)(B). Included within this definition of a "serious health condition involving continuing treatment by a health care provider" is a:

- "Chronic serious health condition," which is defined as one that "(i) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider . . . ; (ii) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (iii) May cause episodic rather than a continuing period of incapacity[10] (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c).

---

[10] "The term incapacity means inability to work . . . or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

- "Permanent or long-term conditions," which is a "period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider.  Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease." 29 C.F.R. § 825.115(d).

- "Conditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider . . . for . . . [a] condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), or kidney disease (dialysis)."   29  C.F.R. § 825.115(e)(2).

Defendants contend that even if Mr. Santiago could demonstrate that he suffered from a serious medical condition, "he was seeking a benefit not provided under the FMLA," which was "to be relieved of ever having to work overtime for his lifetime while employed at the Department of Transportation."  (Defs.' Supp. Mem. at 5.)  Defendants contend that Plaintiff was only "entitled to medical leave during the times that he was incapacitated by his headaches—not medical leave each time the Plaintiff was required to work mandatory overtime to avoid the possibility of triggering a headache."  (*Id.*)

However, the FMLA does not require a complete inability to work fulltime as Defendants imply but rather permits leave to be taken "intermittently or on a reduced leave schedule when medically necessary," 29 U.S.C. § 2612(b)(1).   "A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday" and intermittent leave is "taken in separate blocks of time due to a single qualifying reason."  29 C.F.R. § 825.202(a).

Defendants' view that Mr. Santiago could only receive FMLA leave when he was actually incapacitated by headaches is also belied by the FMLA regulations, which provide

that "absences attributable to incapacity [for chronic conditions] qualify for FMLA leave even though the employee . . . does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days."  29 C.F.R. § 825.115(f).  The examples in the regulation specifically provide that an employee can take leave to avoid the onset of illness, noting that "an employee with asthma may be unable to report for work . . . because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level."[11]  *Id.*

For example, in *Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.*, 180 F. Supp. 2d 922, 931 (W.D. Mich. 2001), the court concluded that the plaintiff's pregnancy qualified as a "serious health condition" although her doctor described her pregnancy as "normal" and she was able to perform her job that required her to stand on her feet all day, but as a "purely prophylactic" precaution, the doctor recommended that she be limited to working a regular schedule without overtime because she risked hypertension and premature delivery if she did not limit her hours and rest more.  The court rejected

---

[11] Defendants do not address this regulation and instead cite *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1167 (11th Cir. 2014), where an employee sent an email to his supervisor requesting eleven weeks of "vacation" and later claimed that it was medically required because he was suffering from depression and anxiety which produced panic attacks.  The Eleventh Circuit held that he did not show he was entitled to leave, because "the FMLA does not extend its potent protection to any leave that is medically beneficial leave simply because the employee has a chronic health condition" but "the FMLA only protects leave for" incapacity or treatment.  *Id.* at 1168.  In *Hurley*, however, the plaintiff did not rely upon 29 C.F.R. § 825.115(f) and admitted that he picked his leave days without any input from a healthcare professional, intentionally selected leave to overlap with holiday weekends, and that his leave was not intended to predict when he would be incapacitated or would receive treatment.

the defendants' argument that the plaintiff's leave would be covered by the FMLA only if she were incapacitated or otherwise could not perform her job, because "she was prevented from working due to the restrictions imposed by her doctor *because* of her pregnancy." *Id.* at 927, 931 (emphasis in original).

At oral argument, Defendants distinguished *Whitaker* on the basis that the plaintiff in *Whitaker* suffered only from a short-term condition whereas Mr. Santiago was an essential employee responsible for clearing the roads and sought a lifetime restriction on overtime, which he could not use the FMLA to accomplish. However, there is no legal support for Defendants' contention that Mr. Santiago's status as an "essential employee" was in any way relevant to his entitlement to FMLA leave, even if Defendants could establish this as a factual matter, which they have failed to do.[12]

Furthermore, FMLA leave is available to an employee precisely because he or she has "a serious health condition that makes [him] unable to perform the functions of [his] position," 29 U.S.C. § 2612(a)(1)(D), temporarily. Only when and if FMLA leave allotment is exhausted does an employee's inability "to perform an essential function of the position," 29 C.F.R. § 825.216(c), become relevant—as to whether the employee is entitled to reinstatement.

---

[12] There is a narrow exception in the FMLA for "certain highly compensated employees," 29 U.S.C. § 2614, that is not claimed in this case.

14

If working overtime were in fact an "essential function" of Mr. Santiago's position, as some courts have held that working overtime can be under the ADA,[13] Mr. Santiago might not be able to use the ADA to avoid overtime.  Yet he claims the right be able to use the FMLA to essentially obtain this same result.  While Defendants' interpretation of the FMLA is overly restrictive, this case does raise the novel question of whether Mr. Santiago could use his yearly FMLA leave allotment to essentially permanently change his position into one in which he was no longer required to work overtime.

This potential result stems from the FMLA's mandate that employers cannot require employees to take "more [intermittent] leave than is necessary" and thus employees can take leave in increments of an hour.  29 C.F.R. § 825.205(a).  As a result, employees can use their yearly allotment of 12 weeks of FMLA leave to significantly alter their schedules.  As the Department of Labor ("DOL") has noted, the statutory entitlement to 12 weeks of FMLA leave per year translates into 480 hours of per year based on a 40 hour work week or 9.2 hours per week or 1.8 hours per work day.[14]

---

[13] See Davis v. Florida Power & Light Co., 205 F.3d 1301, 1306 (11th Cir. 2000) ("[W]e conclude that the district court correctly held that mandatory overtime was an essential function of Davis's C&D position"); Hardwick v. Amsted Ry. Co., 929 F. Supp. 2d 1129, 1136-37 (D. Kan. 2013) ("Courts have recognized repeatedly that mandatory overtime can be an essential function of a job."); Baker v. AVI Foodsystems, Inc., No. 10cv159 (JJM), 2011 WL 6740544, at *10 (W.D.N.Y. Dec. 6, 2011) ("I conclude that working more than eight hours per day was an essential function of the Officer Manager position.").

[14] See "[FMLA] Regulations: A Report on [DOL's] Request for Information," 2007 Update, http://www.dol.gov/whd/FMLA2007Report/2007FinalReport.pdf ("DOL Report"), at 45 n.10.

As Plaintiff's counsel explained at oral argument, because Mr. Santiago's position requires overtime only during periods of snow, the yearly leave entitlement under the FMLA would be sufficient to relieve Mr. Santiago from all of the overtime required for his position except perhaps in the most severe of winters.  Thus, under this scenario, the FMLA could be used to essentially create a new position for Mr. Santiago that does not involve overtime.

The potential for such an outcome has been noted since the inception of the FMLA and it appears to be a result contemplated by the statute and the DOL.  In 1995, adapting regulations interpreting the FMLA, the DOL considered concerns by commentators "that an employee taking intermittent leave could spread the 12-week leave entitlement over an extended period, up to the full 12 month leave period" and considered suggestions that only a portion of the 12 weeks of total leave be eligible for use for intermittent leave or that limitations be imposed on the period during which the intermittent leave could be used.  *See* The Family and Medical Leave Act of 1993, 60 FR 2180-01, 2202.  However, the DOL rejected these suggestions, because the FMLA "makes no provision for limiting the time period over which an employee may take leave intermittently or on a reduced leave schedule," *id.*, and to the contrary provides that the "taking of leave intermittently or on a reduced leave schedule . . . shall not result in a reduction in the total amount of leave to which the employee is entitled . . . beyond the amount of leave actually taken," *id.* (quoting 29 U.S.C. § 2612(b)(1)).

A 2006 report on the FMLA written by the DOL discussed concerns raised by a number of employers "that compliance with the FMLA's intermittent leave provisions . . . when taken for a chronic condition . . . often converted a full-time position into a

permanent, part-time position," because the DOL has taken the position that an employee is entitled to reduced schedule leave under the FMLA even if the condition is permanent and it is unlikely that the employee will ever be able to return to full-time employment.   DOL Report at 44; *see also Opinion Letter Family & Med. Leave Act (FMLA)*, FMLA-97, 1998 WL 1146648, at *2 (July 10, 1998) ("The fact that [a health] condition is permanent and the employee will more than likely not be able to return to full employment in the near future would not diminish the employee's entitlement to FMLA leave, assuming the employee has met all of the employee eligibility tests under the Act.").[15]

A number of employers told the DOL that under this interpretation, the FMLA could be used to obtain results not available under the ADA.  DOL Report at 92.  Under the ADA, an employer must provide reasonable accommodations, including offering part-time or modified work schedules, to qualified individuals with disabilities.  *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o).  However, an employer is not required to eliminate an "essential function" of a position, or offer an accommodation that would impose an "undue hardship" upon it.  "This is because an individual who is unable to perform the essential functions, with or without reasonable accommodation, is not a 'qualified' individual with a disability within the meaning of the ADA."  *See* EEOC Reasonable Accommodation Guidance, General Principles Section.  Moreover, the

---

[15] The DOL report noted that the act had "produced some unanticipated consequences" but did not recommend any specific regulatory changes and issued the report to "provide information for a fuller discussion among all interested parties and policymakers about how some of the key FMLA regulatory provisions and their interpretations have played out in the workplace."  DOL Report, Foreword.

employer has the "ultimate discretion" to choose among reasonable accommodations as long as the chosen accommodation is effective. *Gronne v Apple Bank For Sav.*, 1 F. App'x 64, 67 (2d Cir. 2001) (quoting 29 C.F.R. pt. 1630); *see also Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995) ("We note that 'undue' hardship, like 'reasonable' accommodation, is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also to the benefits to others that will result.  The burden on the employer, then, is to perform a cost/benefit analysis.").

By contrast, the FMLA does not include an "undue hardship" defense and an employer is required to provide the statutorily mandated 12 weeks of FMLA leave regardless of the hardship that results.  *See* Michael J. Ossip, *et al.*, *The Family and Medical Leave Act* (BNA Books 2006) at 290.  However, once that 12 weeks of FMLA leave is exhausted, an employer need not reinstate an employee returning from FMLA leave if that employee is "unable to perform an essential function of the position."  29 C.F.R. 825.214(b).  "Similarly, the FMLA omits any requirement that employers seek to reasonably accommodate employees who cannot perform the essential functions of their respective positions.  Any duty to accommodate the employee is governed solely by the ADA."  *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864–65 (8th Cir. 2006) (internal citations omitted).  While the FMLA regulations note that "the employer may [still] have obligations under the ADA . . ., this reminder does not import the 'reasonable accommodation' qualifier into the FMLA context."  *Tardie v. Rehab. Hosp. of Rhode Island*, 168 F.3d 538, 544 (1st Cir. 1999).

To the extent that Mr. Santiago is able to use his FMLA leave to essentially obtain an accommodation that might not be available under the ADA, this is a result that is

permitted by the statute and been considered by the DOL since the statute's inception. While Congress has considered imposing restrictions on the use of intermittent leave since the original enactment of the FMLA,[16] no such restrictions have been imposed and nothing in the FMLA restricts Mr. Santiago from using the statutory entitlement to leave eliminate overtime.

For example, in *Verhoff v. Time Warner Cable, Inc.* 299 Fed. App'x. 488, 490 (6th Cir. 2008), the plaintiff suffered from "eczema—also known as atopic dermatitis—which is a chronic skin condition marked by visible, irritating skin rashes" and claimed that as a result of this condition he was unable to work more than forty hours a week as a cable installer.  Throughout his employment, Time Warner had required its installers to work overtime on a "standby" basis, where the employee handled after-hours service calls.  *Id.* When the plaintiff informed his supervisor that he was unable to work more than forty hours a week, he was told that working overtime was an essential aspect of his job and that unless he obtained a medical release from his doctor stating that he could work overtime, he would be terminated.  The Sixth Circuit affirmed the district court's holding that the plaintiff's inability to work more than forty hours a week did not make him "disabled" under the ADA but that his employer's refusal to grant him leave from overtime constituted interference with his right to take intermittent leave under the FMLA.  *Id.*; *see also* 478 F. Supp. 2d 933, 939 (N.D. Ohio 2006).

---

[16] In 2003, Congress considered legislation that would allow employers to restrict intermittent leave to increments of at least half a day.  *See* H.R. 35, http://www.gpo.gov/fdsys/pkg/BILLS-108hr35ih/html/BILLS-108hr35ih.htm.

Thus, the Court concludes that Mr. Santiago was not precluded from taking FMLA leave due to the indefinite and prophylactic nature of his request.

**B.      Covered Employer**

Next, the Court considers whether the named individual Defendants are covered employers under the FMLA.[17]   The FMLA defines employer to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."   29 U.S.C. § 2611(4)(a)(ii)(I).   In assessing individual liability under the FMLA, district courts within the Second Circuit have applied the Fair Labor Standard Act's ("FLSA") test of "whether, as a matter of economic reality, an entity is an employer for purposes of the FLSA" to the FMLA because the FMLA definition of employer "tracks that of the FLSA."   *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 475 (S.D.N.Y. 2011). "The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer," *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Falk v. Brennan,* 414 U.S. 190, 195 (1973)), and "beyond the plain language, moreover, the

---

[17] In *Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327, 1332 (2012), the Supreme Court held that "suits against States under this provision are barred by the States' immunity as sovereigns in our federal system," and on this basis, this Court granted [Doc. # 39], the DOT's Motion to Dismiss the claims against it for monetary and injunctive relief and the claims against Ms. Rossi for monetary damages in her official capacity.  As noted in this Ruling, three Courts of Appeals and at least two district courts within this Circuit have nonetheless "concluded that public employees may be held individually liable under the FMLA" based on this statutory language.  (*Id.* at 7 (citing cases)); *see also Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 200 (D. Conn. 2012) ("[A] majority of district courts appear to have allowed for supervisory personnel of public agencies to be held individually liable for violations of the FMLA." (collecting cases)).  Additionally, Plaintiff's claims against Defendants in their official capacities for prospective relief remain.

remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy,'" *id.* (quoting *Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir. 1984)).

The FMLA's broad definition of "employer" has been interpreted to mean that "an individual is subject to FMLA liability when he or she exercises 'supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation' while acting in the employer's interest," *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987)), or he or she "controlled in whole or in part Plaintiff's rights under the FMLA.'" *Smith*, 769 F. Supp. 2d at 475 (quoting *Holt v. Welch Allyn, Inc.,* No. 95–CV–1135, 1997 WL 210420, at *2 (N.D.N.Y. Apr. 15, 1997) (alterations omitted)).

Thus, "the supervisor who uses his authority over the employees whom he supervises to violate their rights under the FLSA is liable for the violation." *Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001). But so too is the "'defendant [who] does not exercise exclusive control over all the day-to-day affairs of the employee[s],'" *Augustine v. AXA Fin., Inc.*, 07 CIV. 8362, 2008 WL 5025017, at *4 (S.D.N.Y. Nov. 24, 2008) (quoting *Freemon v. Foley*, 911 F. Supp. 326, 331 (N.D. Ill. 1995)), as long as she possesses "some control over [the employees'] ability to take protected leave," *Rupnow v. TRC, Inc.*, 999 F. Supp. 1047, 1048 (N.D. Ohio 1998); *see also Rubin v. Tourneau, Inc.*, 797 F. Supp. 247, 253 (S.D.N.Y. 1992) (construing 29 U.S.C. § 2001(2), which contains the same definition of "employer" as the FMLA, to reach any individual who "exerts some degree of control over the employer's compliance with [the statute].").

Several courts have held that sufficient control exists where, as here, a defendant lacking the ultimate power to approve or deny leave was nonetheless partially responsible for the alleged FMLA violation by recommending that leave be denied or by interfering with the employee's ability to take leave. *See Haybarger*, 667 F. 3d at 418 (using Second Circuit precedents as a guide, the court concluded that the defendant was an employer because although he lacked the final authority to dismiss the plaintiff, he recommended that the plaintiff be dismissed); *Freemon*, 911 F. Supp. at 331–32 (finding defendants liable as employers because they recommended that the plaintiff be terminated even though they lacked "unilateral" authority to approve or deny the plaintiff's leave); *Bryant v. Delbar Prods., Inc.*, 18 F. Supp. 2d 799, 809 (M.D. Tenn. 1998) (concluding that the defendant with "all personnel responsibilities" was an employer because he terminated the plaintiff, even though he did so at the direction of his supervisors).

Although Defendant Rossi was not Mr. Santiago's supervisor, the record shows that she was responsible at least in "part for the alleged violation while acting in the [DOT's] interest." *Haybarger*, 667 F.3d at 417.  As the Principal Human Resources Specialist (Rossi Dep. Tr. at 13) and "a manager," (*id.* at 53) Ms. Rossi was responsible for advising supervisors at the DOT regarding FMLA compliance (*id.* at 15, 29–30).  It was Ms. Rossi who, in June 2011, "made the determination" that Mr. Santiago was unable to perform the essential functions of his job and initiated Article 39 proceedings, which ultimately led to Mr. Santiago's separation from employment.  (*Id.* at 136.)  It was also Ms. Rossi who received Mr. Santiago's initial request that he be excused from overtime in May 2011 (Ltr. Santiago to Rossi, Ex. G to Pl.'s 56(a)1), and who signed the June 6 and June 27, 2011 letters to Mr. Santiago advising him first that Article 39 proceeding had

been initiated, and then that no suitable, less arduous assignment was found (Ltrs. Rossi to Santiago, Exs. J & M to Pl.'s 56(a)1). This level of involvement in decisions which allegedly violated Mr. Santiago's FMLA rights is sufficient to demonstrate partial responsibility for Mr. Santiago's claimed injury.

Defendant Paulauskas was similarly partially responsible for the decisions. Ms. Paulauskas, a human resources associate with the DOT (Paulauskas Dep. Tr. at 14) was tasked with receiving and processing FMLA requests, reviewing FMLA eligibility, and advising employees and their supervisors about their eligibility for FMLA leave (*id.* at 15). Ms. Paulauskas testified that she was "the sole person tasked with processing FMLA applications" (*id.* at 112), and when she was asked who made the decision to deny Mr. Santiago's May 2011 leave request, Ms. Paulauskas responded unequivocally: "I did" (*id.* at 38).

Finally, Defendant Alejandro, like Defendants Rossi and Paulauskas bears partial responsibility for the denial of Mr. Santiago's leave requests. Mr. Alejandro, a human resources associate who succeeded Ms. Paulauskas, was responsible for receiving medical certificates, counseling employees regarding their FMLA eligibility, and determining employees' FMLA eligibility. (Alejandro Dep. Tr. at 9–11.) In November 2011, Mr. Alejandro determined that Mr. Santiago was not eligible for FMLA leave. (*Id.* at 16–17.) When Mr. Santiago sent the DOT a medical certificate in November 2011, it was Mr. Alejandro who received and reviewed it. (*Id.* at 20–22.) The record demonstrates that Defendants Alejandro, Rossi, and Paulauskas were partially responsible for the determination of Mr. Santiago's rights under the FMLA and the alleged violations, and

thus Defendants Alejandro, Rossi, and Paulauskas are covered employers under the FMLA.[18]

Defendant Redeker was the highest ranking official within the DOT and had authority over all personnel decisions.  (Redeker Dep. Tr. at 10.)  While Defendants conceded at oral argument that Mr. Redeker had sufficient authority such that he could be considered an employer in certain circumstances, there is no evidence in the record that he actually exercised any of this authority in relation to Mr. Santiago's FMLA rights such that he could be held personally liable for violations.  *See Freemon*, 911 F. Supp. at 332 ("[W]e see no basis for imposing individual liability on defendant Juan Corbin. Although she was Plaintiff's acting supervisor . . . , there is no evidence that she played any role in her discharge.").  Accordingly, Defendants' Motion for Summary Judgment is granted as to Defendant Redeker.

---

[18] The Court recognizes, as other courts have, that

it would be an odd result for supervisors at a State's public agencies to be subject to liability in their individual capacities under the FMLA's self-care provision, when the State agencies for which they work are immune. However, in drafting the FMLA, Congress plainly did not anticipate the Supreme Court's decision in *Coleman,* providing that states retain sovereign immunity.  Thus, there would be nothing odd in Congress's pre-*Coleman* drafting of the FMLA in the way that it did. . . . [T]he result in *Coleman* does not negate the Congressional intent, gleaned from the plain meaning of the FMLA's statutory text, that individual supervisors at public agencies may be subject to liability.

*Reed v. Maryland, Dep't of Human Res.*, CIV.A. (ELH) 12-0472, 2013 WL 489985, at *14 (D. Md. Feb. 7, 2013).

**C.      May 2011 Request**

Defendants do not dispute that in May 2011, Plaintiff was an eligible employee under the FMLA and that he provided notice of his intention to take FMLA leave, but the other elements of his claim are in dispute.

*1.      FMLA-Qualify Medical Condition*

The record is insufficient to determine whether at the time of Mr. Santiago's May 2011 request, he suffered from an FMLA-qualifying serious health condition.  In the May 2011 Medical Certificate, Dr. West checked a box indicating that Mr. Santiago suffered from "Chronic conditions requiring treatments" (May 2011 Medical Certificate at 1), however, under the FMLA, "a chronic serious health condition" is defined as one that requires at least two visits per year for treatment by a health care provider, *see* 29 C.F.R. § 825.11(c), and Dr. West did not complete the section asking for an estimate of Mr. Santiago's future treatment needs (*see* Medical Certificate at 2).  There is no other record evidence regarding Mr. Santiago's future treatment needs and thus neither party has met its burden of demonstrating the absence of a disputed fact regarding whether Mr. Santiago was entitled to FMLA leave.

*2.      Interference or Discouragement*

Defendants contend that even if Mr. Santiago were suffering from an FMLA-qualifying condition, he was not wrongfully denied leave because "[i]t was Plaintiff's choice to put in for disability retirement" and he "was not forced to do so." (Defs.' Opp'n at 17.)  Plaintiff contends that Ms. Rossi wrongfully discouraged him from taking FMLA leave by advising him that he if submitted the Medical Certificate in May 2011, he would be separated from employment under Article 39 of the Union Contract.  (Pl.'s Mem.

Supp. at 21–23.)  There is no dispute that Ms. Rossi understood that Mr. Santiago was disclosing that he had a serious medical condition and was requesting intermittent leave in the form of relief from overtime, and that Ms. Rossi responded to Mr. Santiago's request by stating that if he submitted the Medical Certificate in support of an FMLA leave request indicating that he could not perform overtime, his only options would be to proceed with the Article 39 process that could lead to his dismissal, or apply for disability retirement.  (Rossi Dep. Tr. at 44; Santiago Dep. Tr. at 78.)  Even if Mr. Santiago did not specifically mention the FMLA in requesting relief from overtime, "[t]he FMLA 'does not require an employee to invoke the language of the statute to gain its protection when notifying her employer of her need for leave for a serious health condition.'"  *Edwards v. Cmty. Enterprises, Inc.*, 251 F. Supp. 2d 1089, 1104 (D. Conn. 2003) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

Threatening an employee with termination for requesting leave under the FMLA can constitute interference under a discouragement theory.  *See Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 428 (S.D.N.Y. 2007) ("Avila-Blum alleges that on at least two occasions, Delgado told her outright that she would be fired if she took a period of leave to undergo treatment for her medical condition. Defendants deny this allegation, and therefore there is a genuine issue of material fact as to whether Defendants refused to authorize FMLA leave . . . or discouraged Avila-Blum from exercising her right to such leave."); *see also Goodwin-Haulmark v. Menninger Clinic, Inc.*, 76 F. Supp. 2d 1235, 1242 (D. Kan. 1999) ("[B]y forcing plaintiff to choose between resignation and working without leave, defendant interfered with plaintiff's rights by 'discouraging an employee from using [FMLA] leave.'" (quoting 29 C.F.R. § 825.220(b)) (alterations in

26

original)); *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1134 (9th Cir. 2003) ("The statute and the accompanying regulations protect an employee from *any* employer actions that discourage or interfere with the right to take FMLA leave.").

While under the FMLA, Mr. Santiago's inability to perform an essential function of his position would have precluded him from seeking reinstatement after he exhausted his entitlement to leave, *see* 29 C.F.R. § 825.216(c), there is no record evidence that Ms. Rossi explained this distinction or Mr. Santiago's entitlement to first take leave. Presumably Ms. Rossi would not have interfered with Mr. Santiago's right to take FMLA leave by accurately informing him of this fact, but there is no evidence that Ms. Rossi attempted to make this distinction and Defendants advance no such argument.  Further, while Article 39 of Mr. Santiago's union contract provided for termination if an employee was "physically or mentally incapable of the safe or efficient perform of [his or her] duties," the FMLA explicitly provides that a collective bargaining agreement cannot limit an employee's rights under the FMLA.  *See* 29 U.S.C. § 2652(b) ("The rights established for employees under this Act or any amendment made by this Act shall not be diminished by any collective bargaining agreement or any employment benefit program or plan."); *see also Marrero v. Camden Cnty. Bd. of Soc. Servs.*, 164 F. Supp. 2d 455, 463 (D.N.J. 2001) ("[T]he Camden County Board of Social Services' sick leave policy, and any collective bargaining agreements to which it is a party, must be considered invalid to the extent that they 'diminish' the rights created by the FMLA.").

Thus, the Article 39 termination procedure would only apply if, after Mr. Santiago exhausted his statutory entitlement to FMLA leave, he was unable to perform an essential function of position, in which case the FMLA would not have required his reinstatement.

As the record stands, however, Ms. Rossi's statement gave the inaccurate impression that even the temporary inability of Mr. Santiago to perform the essential functions of his job would lead to termination.   Because a factfinder could determine that Ms. Rossi discouraged or interfered with Mr. Santiago's right to take FMLA leave, Defendant Rossi is denied summary judgment.   However, since Plaintiff has not demonstrated that he was suffering from an FMLA-qualifying medical condition at the time of this request, his motion for summary judgment is also denied.

Defendant Paulauskas contends that she properly denied Mr. Santiago's May 2011 FMLA leave request because he submitted only an incomplete Medical Certificate and no HR1 form required for a FMLA request.  (Defs.' Mem. Supp. at 25; Defs.' Opp'n at 22.) While the FMLA allows an employer to require that "a request for leave . . . be supported by a certification issued by the health care provider," 29 U.S.C. § 2613(a), the employer "shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient" and "must provide the employee with seven calendar days . . . to cure any such deficiency," 29 C.F.R. § 825.305(c).  Only then if the deficiencies are not cured may the employer deny FMLA leave.  *Id.*

There is a dispute of fact regarding whether Mr. Santiago was ever informed that his FMLA request was deficient.  Mr. Santiago claims that he was never provided with any status update or told that his application was incomplete or deficient.  (Santiago Dep. Tr. at 64–65.)   Ms. Paulauskas contends that she "sent him notice twice asking that he provide" a completed Medical Certificate and HR1 form, but Mr. Santiago failed to comply.  (Paulauskas Aff. ¶ 12.)   While generally a "'presumption of receipt' [requiring

more than a mere denial to overcome] applies where 'the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed,'"  *Davis v. Goldstein*, No. 13-2939, 2014 WL 1622822, at *2 (2d Cir. Apr. 24, 2014) (quoting *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010)), here there is no record evidence regarding the manner in which this notice was purportedly sent to Mr. Santiago and what procedures were followed.  In an affidavit, Ms. Paulauskas simply states that she "sent" the notices to Mr. Santiago, without any detail regarding the mode of transmission, and thus there is no basis to presume that Mr. Santiago received such notices.[19]  (*See* Paulauskas Aff. ¶ 12.)

Finally, at oral argument, Defendants contended that because Mr. Santiago was only required to work mandatory overtime during the snow season, and there was no

---

[19] The Third Circuit recently held that a genuine issue of material fact precluding summary judgment was created by an FMLA plaintiff's assertion that she did not receive a required notice of FMLA rights from her employer where the employer could offer no evidence that such a letter was received, explaining:

> In this age of computerized communications and handheld devices, it is certainly not expecting too much to require businesses that wish to avoid a material dispute about the receipt of a letter to use some form of mailing that includes verifiable receipt when mailing something as important as a legally mandated notice.  The negligible cost and inconvenience of doing so is dwarfed by the practical consequences and potential unfairness of simply relying on business practices in the sender's mailroom. . . .  Where, as here, denial of receipt creates a genuine issue of material fact, justice should not give way to expediency or the rigid application of a common law presumption that was adopted long before modern forms of communication and proof could have even been imagined.

*Lupyan v. Corinthian Colleges Inc.*, 13-1843, -- F.3d --, 2014 WL 3824309, at *7 (3d Cir. Aug. 5, 2014).

mandatory overtime at the time of his May 2011 request, he was not denied any benefit that he was entitled to under the FMLA.  Similarly, Defendants contend that because Plaintiff was placed on involuntary leave in July 2011, there was never an occasion where Mr. Santiago requested leave due to his medical conditions but was told to report to work. Plaintiff's claim is not that there was a specific occasion when he requested leave and was forced to work, but rather that his request for prospective leave was denied and as a result of this denial, he was placed on involuntary leave, forced to exhaust his sick leave, and eventually forced to leave the DOT.  This could be found by a factfinder to constitute interference with or discouragement of Mr. Santiago exercising his rights under the FMLA.[20]

### D.      November 2011 Denial of Leave

As to Mr. Santiago's claim that he was improperly denied FMLA leave in November 2011, there is no dispute that he provided proper notice of his request, but the other elements are in dispute.

---

[20] Defendants also contend that the claims against them in their official capacity for prospective relief should be denied as moot now that Plaintiff has returned to the DOT (Defs.' Mem. Supp. at 31) and at oral argument contended that it should also be denied because all Defendants except for Mr. Redeker lack the authority to reinstate benefits and sick leave.  Plaintiff's claim for reinstatement of leave is not mooted by virtue of his return to the DOT and Defendants have introduced no evidence into the record in support of their assertion that they cannot grant Plaintiff the prospective relief that he seeks.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . .  citing to particular parts of materials in the record.").

1.    *Eligible Employee*

Defendants contend that Mr. Santiago's November 2011 request for FMLA leave was properly denied because at that time he was not an eligible employee.  To be eligible for coverage under the FMLA, an employee must (1) have been employed by his or her employer for at least twelve months; (2) completed at least 1250 hours of service during the 12–month period immediately preceding the commencement of the leave; and (3) be employed at worksite where 50 or employees are employed within 75 miles of the worksite.  29 C.F.R. § 825.110(a).  It is undisputed that Mr. Santiago was an eligible employee at the time of his May 2011 request, but Defendants contend that he was no longer eligible as of his November 2011 request because had had not worked 1250 hours in the prior twelve month period as a result of his leave pending disability retirement. (*See* Defs.' Mem. Supp. at 22.)

Regulations promulgated by the DOL, which is charged with enforcement of the FMLA, provide that:

> The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start. An employee may be on non-FMLA leave at the time he or she meets the 12–month eligibility requirement, and in that event, any portion of the leave taken for an FMLA-qualifying reason after the employee meets the eligibility requirement would be FMLA leave.

29 C.F.R. § 825.110(d).  The DOL has taken the "position that the 1,250-hour eligibility test is applied only once, on the commencement of a series of intermittent absences, if all involve the same FMLA-qualifying serious health condition during the same 12-month

FMLA leave year." *Opinion Letter Family & Med. Leave Act (FMLA)*, FMLA-112, 2000 WL 33157366, at *2 (Sept. 11, 2000).[21]

Plaintiff maintains that because he was determined to be eligible for FMLA leave in May 2011, "when he should have been permitted to take FMLA leave, he would have remained eligible throughout the next twelve months." (Pl.'s Mem. Supp. [Doc. # 80-1] at 9.) Defendants have conceded that Mr. Santiago was eligible for FMLA leave in May 2011. At oral argument, they maintained that because Mr. Santiago did not commence FMLA leave in July 2011 but instead took leave pending disability retirement, the DOL opinion letter does not apply and they properly reevaluated his eligibility in November 2011. However, the language of the DOL opinion letter does not refer simply to leave explicitly designated as FMLA leave by an employer but rather to leave that involves an "FMLA-qualifying health condition." Although there is a disputed fact regarding whether Mr. Santiago suffered from an FMLA-qualifying health condition at this time, if Mr. Santiago can establish that his leave from July 2011 through November 2011 was on account of such a condition, he would have been eligible for FMLA leave.

Plaintiff further contends that even if he did not have the requisite hours of service in November 2011, Defendants "are estopped from defending themselves from liability on that theory" because Mr. Santiago would have been ineligible only because

---

[21] "Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing [the FMLA], are at least 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance'" and the Second Circuit has "often relied on them for support." *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 48 & n.1 (2d Cir. 2002) (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642 (1998)).

"Defendants separated him from employment and placed him on unpaid leave in retaliation for having exercised his rights under the FMLA." (Pl.'s Opp'n at 5.) "[A] party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment." *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). The Second Circuit has held that "an employer must notify an employee who plans to take medical leave whether her proposed leave is covered by the FMLA before the employee takes the leave," and "an employer who remains silent when its employee announces that she plans to take medical leave is effectively misleading that employee into believing that she is protected by the FMLA." *Id.* at 726.

Assuming that Plaintiff can demonstrate that he was entitled to FMLA leave in May 2011, was wrongfully denied such leave and told that his only option was to take disability retirement and involuntary leave, resulting in Mr. Santiago's ineligibility in November 2011, Defendants' misrepresentation should estop them from relying on this defense.

### E.    Retaliation Claim (Count Two)

A retaliation claim under the FMLA is analyzed pursuant to the *McDonnell Douglas* standard. "In order to make out a prima facie case, [Mr. Santiago] must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. Defendants only dispute that Mr. Santiago satisfied the third

element, an adverse employment action, because "it was his choice to apply for disability retirement when the results of the less arduous duty search came up negative." (Defs.' Mem. Supp. at 29.)

To show an adverse employment action a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). "Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (alteration in original)).

Mr. Santiago contends that the fact that he "chose" to apply for disability retirement is irrelevant, because he only did so after separation proceedings were instituted against him and did so in an attempt to maintain a source of income. Further, while these proceedings were ongoing, Mr. Santiago was placed on leave for approximately six months, and he was only able to receive pay during that time period by expending his accrued leave time. (Pl.'s Mem. Opp'n at 25.) While being placed on paid administrative leave may not be an adverse employment action because "an employee does not suffer a materially adverse change in the terms and conditions of employment," *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), here Mr. Santiago was placed on unpaid

leave and had to use his accrued leave time to maintain an income, resulting in a loss of these benefits, *see Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 583 (S.D.N.Y. 2008) ("Being placed on unpaid leave and termination of employment constitute adverse employment actions."). Accordingly, Defendants' motion for summary judgment is denied as to Count Two.[22]

### F.      Qualified immunity

Defendants contend that they are entitled to qualified immunity but aside from reciting the general standards, they contend only that "that plaintiff has failed to produce any evidence that the defendants violated any clearly established rights" and "[t]herefore, qualified immunity should be granted to all individual defendants if the Court needs to address this issue." (Defs.' Mem. Supp. at 33.)

Defendants do not cite any authority for the proposition that qualified immunity is applicable for alleged violations of the FMLA. Other courts to address the issue have concluded that FMLA rights are clearly established by statute and a reasonable employer would understand that it is unlawful to deny such rights. *See Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002) ("The individual defendants in this case also assert the defense of qualified immunity. This argument is without merit. The Family and Medical Leave Act creates clearly established statutory rights, including the right to be free of discrimination or retaliation on account of one's exercise of leave rights granted by the statute."); *Adler v.*

---

[22] Because Defendants have not addressed any of the other elements of a retaliation claim, the Court declines to do so for them. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant *shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (emphasis added).

*S. Orangetown Cent. Sch. Dist.*, No. 05cv4835 (SCR), 2008 WL 190585, at *18 (S.D.N.Y. Jan. 17, 2008) ("A reasonable employer would have understood that he could not refuse to return Ms. Adler to the same, or an equivalent, position after she returned from her leave.").  Accordingly, Defendants are not entitled to summary judgment on qualified immunity grounds.

### III.    Conclusion

For the reasons set forth above, Plaintiff's Motion [Doc. # 79] for Summary Judgment is DENIED and Defendants' motions [Doc. # 80] for Summary Judgment is GRANTED as to Defendant Redeker and DENIED as to all other Defendants.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of September, 2014.